UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID ZAMBOROSKI

        Plaintiff,                      Civil Action No. 04-73194

v.                                   District Judge Avern Cohn
                                   Magistrate Judge R. Steven Whalen

RON KARR, DAVID BENAC,
BRUCE BALLE,
and BRUCE ARNOLD,

        Defendants.
_____/

## REPORT AND RECOMMENDATION

    Before the Court is Defendants' Motion to Dismiss and/or for Summary Judgment, pursuant to Fed.R.Civ.P. 12(c) and 56 [Docket # 19]  which has been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).  For the reasons set forth below, I recommend that Defendants' motion for dismissal and/or summary judgment be GRANTED IN PART AND DENIED IN PART, specifically, GRANTED as to Plaintiff's First Amendment claim, but DENIED as to Plaintiff's Eighth and Fourteenth Amendment claims.

## I. FACTUAL BACKGROUND

    Plaintiff, a prisoner within the Michigan Department of Corrections (MDOC), filed

suit against Defendants on August 25, 2004, pursuant to 42 U.S.C. §1983.[1] He alleges that his First, Eighth and Fourteenth Amendment rights were violated during his pre-trial detention at the Montmorency County Jail. Plaintiff, found guilty on January 11, 2000 of murdering confidential police informant Susan Lindbloom, alleges that Defendants denied him regular access to personal hygiene products, allowed him to shower only sporadically, and refused to allow him to attend group worship services during his nine month tenure at the county facility. Defendants contend that the security measures employed were justified by Plaintiff's violent escape attempt during his transport from the Detroit area to the Montmorency County Jail and his subsequent classification as a suicide risk . *Motion to Dismiss* at 2-4. Prior to filing this lawsuit, Plaintiff filed an identical cause of action (02-70465) on February 8, 2002, which was dismissed on June 25, 2003 on the basis of Plaintiff's failure to exhaust his administrative remedies.

## II.  STANDARD OF REVIEW

Fed.R.Civ.P. 12(b)(6) provides for dismissal of a complaint "for failure of the pleading to state a claim upon which relief can be granted." In assessing a Rule 12(b)(6) motion, the court accepts the plaintiff's factual allegations as true, and asks whether, as a matter of law, the plaintiff is entitled to legal relief. *Rippy v. Hattaway,* 270 F.3d 416, 419 (6th Cir. 2001). "[A] complaint should not be dismissed for failure to state a claim unless it

---

[1] Defendant Karr, the Montmorency County Sheriff, is sued in both his individual and official capacities. *Complaint*, ¶4. The other Defendants (Undersheriff David Benac, Sgt. Bruce Balle and Deputy Sheriff Bruce Arnold) are sued in their individual capacities.

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 811, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993)(quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Pursuant to 42 U.S.C.A. § 1997e (a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### III.  ANALYSIS

### A.  EXHAUSTION

### 1.  General Principles

Under the Prison Litigation Reform Act (PLRA) of 1996, specifically 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under § 1983...by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   The exhaustion requirement is mandatory and applies to all suits regarding prison conditions, regardless of the nature of the wrong or the type of relief sought.  *Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983, 984, 152 L.Ed.2d 12(2002); *Booth v. Churner*, 532 U.S. 731, 741, 121 S.Ct. 819, 149 L.Ed.2d 958 (2001).  A failure to exhaust any claim requires the dismissal of the complaint, even if the claims are otherwise properly stated.  *Freeman v. Francis*, 196 F.3d 641, 643-44 (6th Cir. 1999); *Jones Bey v. Johnson*, 407 F.3d 801, 807 (6th Cir. 2005).

A prisoner-plaintiff bears the burden of alleging and demonstrating exhaustion in § 1983 cases, and must provide documentation showing exhaustion, "or, in the absence of written documentation, describe with specificity the administrative proceeding and its outcome."  *Knuckles El v. Toombs*215 F.3d 640, 642 (6th Cir.2000).  *See also  Brown v. Toombs*, 139 F.3d 1102, 1104 (6th Cir. 1998); *Baxter v. Rose*, 305 F.3d 486, 488 (6th Cir. 2002).  However, as long as exhaustion is properly pled in the complaint, the documentation may in some cases be submitted later, for example, in response to a motion to dismiss, if there is a satisfactory explanation for not providing it with the complaint.  *See Casarez v.*

-4-

*Mars*, 2003 WL 21369255 (E.D. Mich. 2003).

To satisfy the exhaustion requirement, an administrative grievance must be factually specific as to both the person and the acts complained of. If a particular defendant has not been specifically named in a grievance, the claim as to that defendant has not been exhausted. In *Curry v. Scott*, 249 F.3d 493 (6th Cir. 2001), the Sixth Circuit adopted a bright line rule that a grievance must specifically name the person who is ultimately sued. In reaching its conclusion, *Curry* relied in part on *Freeman v. Francis, supra* at 644, where the Court stated that "the importance of using the prison grievance process [is] to alert prison officials to problems."

Exhaustion under §1997a requires an inmate to complete all levels of the administrative review process before filing an action in federal court. *See Freeman*, 196 F.3d at 645. A prisoner "cannot abandon the process before completion and claim that he has exhausted his remedies." *Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir. 1999). However, the prison or jail also has a responsibility to timely respond to an inmate's written grievance, and may not frustrate the exhaustion requirement by indefinitely delaying a response. In such case, the institution's inaction renders further administrative remedies unavailable to the prisoner, and those remedies will be deemed to have been exhausted. *Boyd v. Corrections Corporation of America*, 380 F.3d 989, 996 (6th Cir. 2004)[2]; *Thompson v. Koneny*, 2005 WL

_____

[2]*Boyd* followed the rule set forth by the 5th, 7th, 8th and 10th Circuits, citing *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) ("[W]e agree that the failure to respond to a grievance within the time limits contained in the grievance policy renders an administrative remedy unavailable[.]); *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002) ("We join the

1378832 (E.D. Mich. 2005).[3]

### 2.   The Montmorency County Grievance Procedure

The parties agree that the following written policy controls the grievance procedure

at the Montmorency County Jail:

**INMATE PROCEDURE**

i.      A corrections officer will:

   1.  Receive the grievance.

   2.  Resolve to the satisfaction of the inmate.

   3. Make written note in daily log to inform other shifts of action taken.

   4.  If unable to resolve, forward to supervisor forthwith.

ii.     The Undersheriff will:

   1.  Confer with the inmate(s).

   2.  If resolved, report in writing to the Sheriff with a copy to the inmate.

   3.  If unable to resolve to satisfaction of inmate, forward written

_____

Eighth and Fifth circuits on this issue because we refuse to interpret the PLRA 'so narrowly as to...permit [prison officials] to exploit the exhaustion requirement through indefinite delay in responding to grievances.'"); *Foulk v. Charrier*, 262 F.3d 687, 698 (8th Cir. 2001) ("[O]nce [the prison] failed to respond to [the prisoner's written grievance], no further administrative proceedings were 'available' to him."); and *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999) ("A prisoner's administrative remedies are deemed exhausted when a valid grievance has been filed and the state's time for responding thereto has expired.").

   [3] In *Thompson*, the Court found that a "six and a half month response time cannot be deemed 'timely' under *Boyd* or any other reasonable standards." *Id.* at *5.

grievance to the Sheriff.

4.  Review the grievance and reply to the inmate within 24 hours excluding weekends and holidays.

iii.    The Sheriff/Undersheriff will:

1.  Review the grievance within 48 hours excluding weekends and holidays.

2.  The Sheriff/Undersheriff's decision would be presented in writing within three days of the hearing, excluding weekends and holidays.  Copy to the inmate, Sheriff and the inmate record.

iv.    The Sheriff will have final appeal and review in any hearing board case.

Under this policy, the inmate has the burden at the first step to submit a written grievance to the corrections officer.  If the grievance is not resolved, the officer has the obligation to "forward to [his] supervisor forthwith."  Likewise at the second step, the Undersheriff who has received the grievance must either resolve the complaint or forward it to the Sheriff, who has 48 hours to review the grievance.  Unlike the Michigan Department of Corrections policy, which places an affirmative burden on the inmate to initiate each step of the process, the Montmorency County procedure requires the inmate only to initiate the first step; Sheriff's personnel, not the inmates, have the duty to initiate subsequent levels of review.

### 3.    Application to Plaintiff's Case

Plaintiff's case was previously dismissed without prejudice based on the failure to

exhaust administrative remedies.[4]   By that time, Plaintiff was no longer housed at the Montmorency County Jail, but was serving his sentence in a state prison.   Nevertheless, following dismissal, Plaintiff undertook the following actions to attempt to exhaust:

-On June 28, 2003, Plaintiff sent letters to Defendants Sheriff Ronald J. Karr, Undersheriff  Benac, Sgt. Bruce Balle and Deputy Bruce Arnold,  requesting a grievance form and stating that he wanted to grieve conditions of confinement including (1) being place in a holding cell for 274 days; (2) being kept in belly chains and leg irons for 274 days; (3) denial of exercise; (4) denial of showers; and (5) denial of opportunity to participate in religious services.

-Not having received a reply, Plaintiff wrote a second letter to all the above Defendants on July 28, 2003, again requesting a grievance form, and again describing the nature of the grievance he wished to file.

-On August 13, 2003, Plaintiff sent a third request for a grievance form, substantially the same as the first two, to all Defendants.

-On September 29, 2003, Plaintiff wrote yet a fourth request for a grievance form to all Defendants, again outlining the specific nature of his complaints.  On that date, he also wrote a letter to attorneys Christopher K. Cooke, Gretchen L. Olsen, Camille T. Horne and Gail P. Massad, the Defendants' lawyers, complaining that neither Karr, Benac, Balle nor Arnold had complied with his repeated requests for  grievance forms, and asking for

---

[4] Docket No. 02-70465, dismissed June 25, 2003.

assistance.  Plaintiff again outlined the nature of the violations he was alleging.

Time passed, and still Plaintiff received no reply of any kind.  Finally, on June 21, 2004, he wrote another letter to Sheriff Karr, stating:

> "I have made repeated attempts by mail to obtain a grievance form from the Montmorency County Jail staff.  As my attempts have been unsuccessful, I am submitting my grievance in simple written form."

Plaintiff named Karr, Benac, Balle and Arnold as the grievants, and set forth in greater factual detail the conditions of confinement he had raised in his previous letters.

Having received no response to this or any other letter directed to the Defendants and their attorneys, Plaintiff filed his Complaint in this Court on August 18, 2004, alleging exhaustion and describing his attempts to pursue administrative remedies.[5]

Under these facts, Plaintiff should be deemed to have exhausted his administrative remedies as to all Defendants and all claims.  Between June 28 and September 29, 2003,[6] he wrote four letters to each of the Defendants/grievants, not only requesting grievance forms, but setting forth the precise nature of his claims.  No longer being housed in the County Jail, he had no access to the "official" grievance forms, and it is clear that despite his repeated

_____

[5]Although copies of the Plaintiff's many letters to the Defendants were not attached to the Complaint, they were submitted, along with proof of mailing, with a pleading titled "Plaintiff's Cross-Motion for Partial Summary Judgment," in which he also expanded on his exhaustion argument.  Under *Casarez v. Mars, supra*, this constitutes sufficient compliance with the *Knuckles-El* requirement that plaintiffs provide documentation showing exhaustion.

[6]Plaintiff wrote his first letter to Defendants within three days of the dismissal of his previous Complaint, thereby demonstrating diligence in his attempt to exhaust administrative remedies.

requests, the County had no intention of supplying him with one. The purpose of administrative remedies being "to alert...officials to problems," *Freeman v. Francis, supra*, 196 F.3d at 644, Plaintiff's four letters may properly be considered his first-step grievances.[7] At that point, under County policy, the burden shifted to the Jail to take some action. If the grievance was rejected, the grievant, not the Plaintiff, had the responsibility to send it to the next level of review. Thus, *Hartsfield v. Vidor, supra* and *Cross v. Horton*, 80 Fe.Appx. 430 (6th Cir. 2003), cited by Defendants, are inapplicable, since in those cases, the unfulfilled burden of administrative appeal fell to the plaintiffs.

Despite numerous requests to the Defendants and even their attorneys, they did nothing. They essentially made their own grievance procedure a nullity. Under *Boyd* and *Thompson, supra*, this is a case where the Defendants, through their own non-feasance, have "exploited the exhaustion requirement" and rendered any further administrative remedies unavailable to the Plaintiff.

The PLRA places an oftentimes daunting burden on prisoners to fully exhaust all administrative remedies, and prison officials are quick to insist on strict compliance with their grievance policies. There is no reason to relax that level of expected compliance and be more forgiving of correctional authorities when it is they who flaunt their own rules and policies. Plaintiff has done everything within his power to comply with §1997e(a), and this

---

[7]Each of the four letters was addressed to, and thus named, the person who was the target of the grievance. Hence, they complied with the requirement of *Curry v. Scott* that a grievance specifically name the person grieved.

Court may therefore proceed to address the merits of his claims.

## B.   CONSTITUTIONAL CLAIMS

Defendants, quoting *Upsher v. Grosse Pointe Public School System,* 285 F.3d 448, 452 (6th Cir. 2002), concede that they were acting under color of state law, but deny that Plaintiff's Constitutional rights were violated.  *Motion to Dismiss and/or Summary Judgment* at 6.  Defendants argue that as a result of Plaintiff's history of violent behavior, their actions denying Plaintiff regular access to showers, hygiene products, outdoor exercise, as well as the use of restraints was "reasonably related to a legitimate governmental objective." *Id.* at 6; *Bell v. Wolfish,* 441 U.S. 520, 538, 99 S.Ct. 1861, 1874 (1979).  As discussed in detail below, Plaintiff's lawsuit, which alleges First, Eighth, and Fourteenth Amendment violations is not subject to dismissal pursuant to either Fed. R. Civ. P. 12(b)(6) or 56.

## 1.  EIGHTH AND FOURTEENTH AMENDMENTS

Because Plaintiff spent 234 days at the county prison as a pre-trial detainee and 42 days as a convicted felon  before transfer to a state facility, he claims both  Eighth and Fourteenth Amendment violations.  Although pretrial detainees' rights are based on the Fourteenth Amendment's Due Process Clause, they are analogous to the Eighth Amendment rights of prisoners, *see Barber v. City of Salem, Ohio,* 953 F.2d 232, 235 (6th Cir. 1992), in order "to avoid the anomaly of extending greater constitutional protection to a convict than to one awaiting trial." *Roberts v. City of Troy,* 773 F.2d 720, 723 (6th Cir. 1985).  Thus, Plaintiff's claims will be analyzed under an Eighth Amendment paradigm.

The Eighth Amendment proscribes the infliction of cruel and unusual punishment

upon prisoners.  In order for a prisoner to establish an Eighth Amendment violation under § 1983, he must allege and prove an unnecessary and wanton infliction of pain, or the infliction of pain totally without penological justification.  *See Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 346 (1981).  Eighth Amendment claims must satisfy a two-prong standard.  First, the alleged wrongdoing must be "objectively harmful enough" to establish a constitutional claim (objective component).  Second, the prison official must act with the requisite state of mind (subjective component).  *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), citing *Wilson v. Seiter*, 501 U.S. 294, 298, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

The objective component is contextual and responsive to "contemporary standards of decency."  *Hudson*, 503 U.S. at 8 (citing *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).  The Supreme Court has clearly held that "when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated."  *Id.* at 9.  Therefore, a prisoner need not show a significant injury.  *Id.; Moore v. Holbrook*, 2 F.3d 697, 701 (6th Cir. 1993) (citing *Hudson* to conclude that the extent of injuries does not provide a basis for dismissal).

The subjective component is evaluated by "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  *Whitley v. Albers*, 475 U.S. 312, 320-321, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) , citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973), *cert. denied sub nom, John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). *See also Hudson*, 503

-12-

U.S. at 6-7 (extending *Whitley* to all cases of excessive force by prison officials).   The factors to be considered when weighing the conduct of prison officials are: 1) the need for the application of force; 2) the relationship between the need for force and the amount used; and 3) the extent of the injury inflicted. *Whitley*, 475 U.S. at 321.

### a.   Use of Restraints

Defendants argue that the apparently continuous use of restraints (belly and leg chains) for the 276 days of Plaintiff's incarceration at the county jail was constitutionally permissible, stating that "a valid penological interest for security and safety justified Defendants' action." *Motion to Dismiss and/or Summary Judgment* at 9.  Defendants cite Plaintiff's generally violent criminal history, his poisoning of a confidential informant, and his violent escape attempt en route to the county jail to justify the use of restraints for the duration of Plaintiff imprisonment, alleging further that during his stay, he inquired about the location of security cameras at the courthouse, and attempted suicide on August 27, 2000 by tying a string around his neck. *Id.* at 10.  Defendants allege that on September 8, 2000, guards discovered string connected to "a metal object" hidden in Plaintiff's cell, leading them to believe that Plaintiff either intended to use the string to hang himself, or to overpower his jailers. *Id.*[8]

---

[8]Although *Motion to Dismiss and/or Summary Judgment* at 10 states that the string was discovered on September 8, 1999, Defendant Ball's affidavit (Exhibit 11) and daily logs submitted by Defendants (Exhibit 4) indicate that Defendant Ball discovered the string on September 14, 1999 rather than September 8, 1999.  In any case, as discussed *infra*, it appears that Plaintiff did not engage in further disruptive and/or harmful behavior after mid-September, 1999.

Defendants cite *Kennedy v. Doyle,* 37 Fed.Appx. 755, 756 -757 (6th Cir. 2002), an unpublished Sixth Circuit case, in support of their use of restraints. The *Kennedy* court found that placing the plaintiff in restraints on "numerous occasions" did not violate his Eighth Amendment rights after he continued to break the window of his prison cell after he had first been placed in restraints, stating that "physical restraints are constitutionally permissible where there is penological justification for their use." Defendants also cite *Rivers v. Pitcher,* 68 F.3d 475, 1995 WL 603313, 2 (6th Cir. 1995) (unpublished), which upheld summary judgment for the defendants who had placed and kept the plaintiff in restraints after he had flooded his cell, attacked officers, and exhibited "abusive, disruptive, and threatening behavior."

Significantly, neither of the above opinions stated for what duration each prisoner was shackled or placed a time limit on the justifiable use of restraints after the prisoner had ceased behaving disruptively. Defendants in the present case do not contradict Plaintiff's allegation that he was placed in restraints continually for 276 days, excepting his shower time and his two exercise periods. Defendants do not allege that he engaged in further disruptive or threatening behavior after September 8, 1999, when they discovered orange string in his cell. Assuming that the discovery of string represented either a threat to Plaintiff's well-being or prison security, it does not appear to adequately justify the continual use of restraints between mid-September of 1999 and Plaintiff's transfer to a state facility on February 23, 2000. In *Williams v. Vidor,* 17 F.3d 857, 859 (6th Cir. 1994), the court reversed the district court's grant of summary judgment to a defendant officer, holding that a question of fact

remained as to whether the plaintiff's Eighth Amendment rights were violated by his *seventy-two hour* placement in restraints. The dissent, which disagreed with the majority opinion affirming summary judgment for another defendant, cited Michigan Department of Correction's (MDOC) Policy Directive, which stated that the "[u]se of restraints beyond an 8-hour period requires the supervision of medical personnel. They shall visit the prisoner at least twice during each shift . . ." *Williams,* 17 F.3d at 862 -863 (dissent). Although the present Defendants are employed by a county jail and not subject to the above regulation, the MDOC directive, which states that *any* use of restraints beyond eight hours is subject to medical monitoring, serves as a fair yardstick for assessing the generally appropriate, non-punitive use of restraints. Significantly, Defendants fail to cite any case law which permits the continuous use of restraints for *five months* following a security threat or disciplinary incident.[9] *See Preston v. Thompson,* 589 F.2d 300, 301 (7th Cir. 1978) (upholding the grant of injunctive relief to prisoners forced to endure lock down or "emergency" measures three months after a riot ended, stating that the "emergency situation" ceased to exist soon after the riot ended). At the very least, whether placing Plaintiff in restraints for five month following the documentation of disruptive behavior violates his Eight Amendment rights presents a genuine issue of material fact.

---

[9]Although Defendants allege that finding string in Plaintiff's cell on September 8, 1999 reasonably led them to believe that Plaintiff was a suicide risk, they apparently did not provide Plaintiff any further mental health treatment after that date.

### b.  Denial of Out-of-Cell Exercise

Defendants, apparently conceding that Plaintiff was permitted out-of-cell exercise on only two occasions during his 276 day incarceration, argue that denying Plaintiff exercise was justified by security concerns.  *Motion to Dismiss and/or Summary Judgment* at 10. Defendants argue that the present case is distinguishable from cases such as *Patterson v. Mintzes,* 717 F.2d 284, 289  (6th Cir. 1983), which recognized that "a total or near total deprivation of exercise or recreational activity" violates the Eighth Amendment,  pointing out that the *Patterson* court limited the rule to instances  where such a deprivation was "without penological justification." *Id.* at 289.

The court in *Patterson v. Mintzes,* 717 F.2d at  289,  finding that whether prison officials denied Plaintiff of out–of–cell exercise for forty-six days created an issue of material fact implicating his Eighth Amendment rights, stated that "[i]t is generally recognized that a total or near-total deprivation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees. Inmates require regular exercise to maintain reasonably good physical and psychological health." The court in *Walker v. Mintzes,* 771 F.2d 920, 927 (6th Cir. 1985), rejecting a bright-line rule on a constitutionally appropriate amount of "yard time," stated that "the trial court must seek the *minimum* amount of yard time necessary for the inmates' well-being under minimal civilized standards." *Id. See also, Spain v. Procunier,* 600 F.2d 189 (9th Cir.1979).  Further, "any minimum standard should be set "in relation to the other types of restrictions placed on the inmates." *Id.* "Although exercise and other recreational pursuits are not necessarily a core concern of the

-16-

Eighth Amendment, under certain circumstances a deprivation of recreational opportunities can violate the Constitution." *Knop v. Johnson,* 667 F.Supp. 467, 476 (W.D.Mich.,1987); *Walker,* 771 F.2d at 927- 28.  In *Wilson v. Seiter,*  501 U.S. 294, 304-305, 111 S.Ct. 2321, 2327 (U.S. 1991), the Court held that exercise was one of *"some* conditions of confinement [which] may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." The Court, endorsed the analysis of *Spain, supra,* and *Clay v. Miller,* 626 F.2d 345, 347 (4th Cir. 1980), which stated that "outdoor exercise [was] not required when prisoners otherwise had access to dayroom 18 hours per day."

At a minimum, there is a genuine issue of fact as to whether Defendants' denial of out-of-cell exercise for 274 days out of Plaintiff's 276 day confinement violated his Eighth Amendment rights, and therefore summary judgment is inappropriate.  First, forbidding Plaintiff out-of-cell exercise for more than an average of one day out of 138 days articulates a level of deprivation that surpasses any of the cases cited above.  *See Patterson, supra,* (prisoner denied out-of-cell exercise forty-six days created an issue of fact); *Spain, supra* 600 F.2d at 199 (constitutional rights implicated when segregated prisoners' out-of-cell exercise was limited to less than an hour five days per week in the corridor outside the cells when prisoners were otherwise cell-bound). *But see Clay, supra,* 626 F.2d at 347 (no constitutional rights violated because the prisoner had access to a day room eighteen hours a day for exercise.)

Second, Plaintiff's uncontradicted allegation that he received virtually no opportunity for nine months must also be evaluated in the context of his entire incarceration per *Wilson, supra*. Assuming, *arguendo*, that denying Plaintiff more than two exercise periods in 276 days did not in and of itself trigger constitutional claims, Defendants concede that along with denying Plaintiff exercise, Plaintiff spent the rest of his imprisonment cell-bound in shackles. While Defendants argue that Plaintiff's violent history justified denying him exercise, Plaintiff did not exhibit any disruptive behavior between September 8, 1999 and his transfer to a state facility on February 23, 2000 . This substantially undercuts Defendants' claim that they were "penologically justified" in denying Plaintiff exercise for an apparently indefinite period of time.

### c. Hygiene

Defendants dispute Plaintiff's claim that he received only fourteen showers during his incarceration, citing daily logs kept by the prison which indicate that he was allowed to shower forty-two times. *Motion to Dismiss and/or Summary Judgment* at 12.  They note that Plaintiff received "general hygiene materials" each time he showered, adding that he requested and received hygiene material on twenty-two additional occasions. *Id.* at 12-13. Defendant Karr's affidavit states that Plaintiff "was offered a shower at least once per week during his entire incarceration." *Id.* at Exhibit 3.  Defendants cite *Argue v. Hofmeyer,* 80 Fed. Appx. 427 (6th Cir. 2003), arguing that Plaintiff's claim of cruel and unusual punishment fails to satisfy both the objective and subjective components of an Eighth amendment claim.

In *Walker,* 771 F.2d at 928 , the court held that prisoner should be "afforded at least

-18-

one shower per week as a constitutional minimum." *See also Rivers, supra*,  68 F.3d  475.  If one assumes, for the sake of argument, that Defendants' assertion that Plaintiff received 42 showers over the course of nine months is accurate, Plaintiff still received fewer showers than the constitutional minimum of one per week.  Defendants' brief list  42 dates on which Plaintiff allegedly received showers, however, in at least eleven instances, Plaintiff went without a shower for over seven days.[10]  Although Defendant Karr's affidavit states that staff offered Plaintiff a shower at least once a week, he fails to specify which officer offered Plaintiff a weekly shower, and offers no other documentation to support his statement.[11]  The sole statement made by Karr stands at odds with Plaintiff's allegations that he frequently requested, but was denied access to the shower.  *Complaint* at ¶¶15-52.  Plaintiff's allegations  are supported by the affidavit of Dennis Shepler, a fellow prisoner who stated that on August 23, 1999, Defendant Balle refused Plaintiff's request for a shower. *Response to Motion for Summary Judgment*, Exhibit 1.  Jason M. Pelton, another prisoner housed at the Montmorency County Jail states that on five separate occasions between December 10, 1999 and February 22, 2000, he observed Plaintiff in "belly-chains and leg irons, with a very unclean appearance," looking as if "he had neither shaved nor bathed in weeks." *Id.*  Pelton

---

[10]Defendants concede that at one point, Plaintiff went without a shower for fourteen days (October 12 - 28, 1999). *Motion to Dismiss and/or Summary Judgment* at 12

[11]Exhibit 4 (a portion of the daily logs created during Plaintiff's incarceration), which apparently list all of staff's interaction with inmates on a daily basis, does not appear to include an offer by staff to allow Plaintiff to shower on any days other than the 42 "shower days" cited by Defendants.

states that when he asked Plaintiff on December 10, when he had last bathed, Plaintiff answered "weeks." *Id.*[12] Plaintiff's allegation that he was not afforded a constitutional minimum number of showers,  an eyewitness report which states that Plaintiff appeared disheveled and unbathed over the course of two and a half months, and further testimony indicating that staff refused Plaintiff access to the showers creates a question of material fact sufficient to survive summary judgment.[13]

## 2.   FIRST AMENDMENT–RIGHT TO WORSHIP

Defendants dispute Plaintiff's claim that his First Amendment rights were violated by denying him access to group worship. *Motion to Dismiss and/or Summary Judgment* at 14. Defendants maintain that forbidding Plaintiff group worship was "reasonably related to a legitimate penological interest." *Id.* at 15; *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

"[C]onvicted prisoners do not forfeit all constitutional protections by reason of their

---

[12]Actually, Pelton's statement that Plaintiff said on December 10, 1999 that he had not bathed in "weeks"  contradicts Plaintiff's statement that he received a shower on December 7, 1999.  (Complaint at ¶51) but comports with the daily logs showing that on December 10, he had not received a shower in seven days.  *Motion to Dismiss and/or Summary Judgment,* Exhibit 4.

[13]As stated above, Defendants rely on *Argue*, to support the proposition that as long as Plaintiff received *some* hygiene materials, his constitutional rights were not violated. However, *Argue* makes no mention of the amount of hygiene products the plaintiff received that placed it above the constitutional minimum.  Further, the prisoner in *Argue* maintained that he should not be forced to choose between exercise and showers for the one hour out of twenty-four each day when he was not confined to his cell.  In the present case, Plaintiff, for the vast majority of  his incarceration, did not received neither shower or exercise time.

conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60

L.Ed.2d 447 (1979). Earlier this year, the Supreme Court, discussing the Religious Land Use

and Institutionalized Persons Act (RLUIPA), found that although the Act adopts a

compelling interest standard, it "does not elevate accommodation of religious observances

over an institution's need to maintain order and safety. An accommodation must be measured

so that it does not override other significant interests." *Cutter v. Wilkinson,* 125 S.Ct. 2113,

2115 (2005). The Court noted further that "[l]awmakers supporting RLUIPA were mindful

of the urgency of discipline, order, safety, and security in penal institutions and anticipated

that courts would apply the Act's standard with due deference to prison administrators'

experience and expertise." *Id.*

Although Plaintiff alleges that his requests to participate in group worship were denied

nine times by prison staff (*Complaint* at ¶¶ 27- 29, 34, 37, 46, 48, 50, 52), he acknowledges

that he was given a bible and allowed to visit regularly with a clergyman. *Deposition of

Plaintiff,* pg. 179 , Exhibit 1 of *Motion to Dismiss and/or Summary Judgment.*  Unlike

Plaintiff's Eighth and Fourteenth Amendment claims in which he alleges a denial of exercise

and showers which clearly places his treatment below the constitutionally acceptable

minimum, Defendants appear to have balanced Plaintiff's First Amendment rights against

their "significant interest" in maintaining  a secure prison environment.  First, allowing

Plaintiff, an identified flight risk who forcibly resisted arrest, to participate in a  worship

service with other inmates would arguably have posed a much greater security risk than

taking him to a shower or outside for exercise by himself.  Defendants state that Plaintiff,

who was convicted of poisoning a confidential informant preparing to testify against him at a drug possession trial, asked about the whereabouts of the co-defendant who subsequently testified against him at his murder trial. *Motion to Dismiss and/or Summary Judgment* at Exhibit 5.  Defendants displayed a well-founded concern that allowing Plaintiff contact with other prisoners might undermine institutional security.  Second, Defendants acknowledged Plaintiff's right to worship (albiet, tempered by security interests) by giving him a bible and access to clergymen, who visited Plaintiff on a regular basis after the weekly worship service. Defendants have demonstrated that they accommodated Plaintiff's First Amendment rights to the extent possible without compromising their need to maintain order and safety.

## C.   QUALIFIED IMMUNITY

Citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818,  102 S.Ct. 2727, 2738 (1982), Defendants argue that they are entitled to qualified immunity for their "discretionary acts that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Motion to Dismiss and/or Summary Judgment* at 15.

Under *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), a state official is protected by qualified immunity unless the Plaintiff shows (1) that the Defendant violated a constitutional right, and (2) the right was clearly established to the extent that a reasonable person in the defendant's position would know that the conduct complained of was unlawful.  In *Higgason v. Stephens*, 288 F.3d 868, 876-877 (6th Cir. 2002), the Sixth Circuit set forth a three-part test to determine whether a government official is entitled to the

-22-

defense of qualified immunity: (1) was there a violation of a constitutionally protected right; (2) was that right clearly established at the time; and (3) has the plaintiff alleged and shown by sufficient evidence that what the official allegedly did was objectively unreasonable?

Defendants' argument for qualified immunity as applied to Plaintiff's Fourteenth/Eighth Amendment claims fails.[14]   According to *Saucier,* 533 U.S. at 206, 121 S.Ct. at 2158 "[q]ualified immunity operates . . .to protect officers from the sometimes 'hazy border between excessive and acceptable force, and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful" (internal citations omitted).  Notably, Defendants do not  support their qualified immunity argument with any case law suggesting that the conditions of Plaintiff's confinement were "objectively reasonable."

While Defendants' motion states numerous times that their actions  were justified by Plaintiff's  violent history, this argument is unpersuasive, considering that every maximum security prison in the State of Michigan is filled with inmates with a "violent history," yet for the most part, these institutions have established protocols which satisfy the safety concerns of the institution without violating prisoners' constitutional rights. Leaving an inmate in shackles continually for 276 days, while denying him exercise and showers, suggests unambiguously forbidden conduct which does not approach that "hazy border"

---

[14]While Plaintiff mentions Defendant Arnold only once in his factual allegations (Complaint at ¶14) he alleges unspecified Eighth and Fourteenth Amendment violations by Arnold, along with the other three Defendants¶¶ 58-63. Further, *Motion to Dismiss and/or Summary Judgment* at Exhibit 4 indicates that Arnold was on duty numerous times during Plaintiff's imprisonment, and thus to a large extent, overseeing the conditions of his incarceration.

between lawful and proscribed actions designed to protect well-meaning law-enforcement officers subject to suit over "gray areas" of the law.  Plaintiff's claims, supported by affidavits which create at least an issue of material fact, allege practically medieval conditions, and are not subject to dismissal on the basis of qualified immunity.

### D.   OFFICIAL POLICY OR CUSTOM

Defendant argues that the claims against Defendant Karr in his official capacity should be dismissed on the basis that he has not alleged injuries that were inflicted "pursuant to the municipality's policy or custom." *Motion to Dismiss and/or Summary Judgment* at 17; *Monell v. Department of Social Services of City of New York* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037 - 2038 (1978).

In *Monell*, the Supreme Court held that under § 1983, municipal liability is not unlimited, and that a municipality could not be liable on a theory of *respondeat superior*: "A municipality cannot be held liable *solely* because it employs a tortfeasor - - or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.*, 436 U.S. at 691, 2036. (Emphasis in original).  However, the *Monell* Court found that when the acts of individual employees represent the government's custom or policy, the municipality can be held liable. *Id* at 638, 2037-2038.

In  *Johnson v. City of Detroit*, 944 F.Supp. 586, 598 (E.D. Mich. 1996), the Court explained, "The requirement of an official policy distinguishes the acts of the employee from those of the municipality, ensuring that the municipality is held responsible only for the latter."

-24-

Nevertheless, a municipal policy need not be formal or written to bring § 1983 into play.  It can be found in "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute 'custom or usage' with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)(citations omitted).  In addition, § 1983 liability can be based on a policy of inadequate training or supervision, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Further, in *Memphis, Tennessee Area Local, American Postal Workers Union*, 361 F.3d 898, 902-903 (6th Cir. 2004) the court found that "[a] municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice." *See also  Fletcher v. O'Donnell*, 867 F.2d 791,792-794 (3rd Cir. 1989).  If it is shown that the city "knew or reasonably should have known" that the actions of its police officers were unlawful, this would support a claim that the city was "deliberately indifferent" to the rights of Plaintiffs, which in turn "can be properly thought of as a city policy or custom that is actionable under § 1983." *Memphis* at 904.

Pursuant to *Memphis*, Plaintiff has alleged facts which, if proven, implicate municipal liability.  First, Plaintiff alleges that Defendant Karr oversaw and directed the conditions of his confinement. As County Sheriff, Karr was the in fact the principle policymaking County official regarding jail administration.  Paragraph 18 of the Complaint alleges that Defendant Karr told Plaintiff that he had "no right to shower," informing Plaintiff that whether he

-25-

showered would be left to Defendant Ball's discretion.  Paragraph 22 alleges that on a later date when he asked  Defendants Karr and Ball if he would be permitted to shower,  Karr again replied that the matter would be left to Ball's discretion.  Such a statement by the county's sheriff ( a key policy-maker), if true, implies that on repeated occasions, Defendants conformed to a policy or custom, albeit an unwritten one, which permitted the repeated violation of Plaintiff's constitutional rights.  Second, Plaintiff  alleges that Sheriff Karr not only acquiesed, but directly participated in denying Plaintiff's constitutional rights.  Plaintiff alleges that on least twenty occasions, Defendant Karr ordered him to remain in shackles, and either denied him access to a shower or the opportunity to exercise.

Third, an affidavit supplied by Daniel Troy Teribery states that during his one month pre-trial incarceration at the Montmorency County Jail in 1996, he was "chained to eye-bolts in the wall and left there for many days" after complaining to Karr about being forced to wear "either handcuffs and leg restraints" or "belly chains" for his entire confinement. *Reply to Defendants' Response to Plaintiff's Cross-Motion* at Exhibit 5.  He states further that although he never committed any act designed to threaten or hurt prison staff, on certain occasions, after complaining to Sheriff Karr, he would be "mass assaulted" and "beaten mercilessly" by jail guards, including Defendants Arnold and Ball.  *Id.*  He states that Defendant Karr told him that he could not "commit offenses against members of this community and get away with it." *Id.*

Plaintiff's allegations, coupled with  Teribery's affidavit that he endured similar treatment at the hands of the county jail's primary policy-maker, states a claim of municipal

-26-

liability and creates an issue of fact sufficient to survive summary judgment.

## IV. CONCLUSION

I recommend, for the reasons stated above, that Defendants' motion for dismissal and/or summary judgment be GRANTED IN PART AND DENIED IN PART. I recommend that the motion be GRANTED as to Plaintiff's First Amendment claim, and that that claim be dismissed with prejudice. I recommend that the motion be DENIED as Plaintiff's Eighth and Fourteenth Amendment claims.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue

contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  August 12, 2005

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 12, 2005.

s/G.K.Wilson
Judicial Assistant